613 A.2d 1023

**MAYOR AND CITY COUNCIL of BALTIMORE**

**v.**

**BALTIMORE FIRE FIGHTERS, LOCAL 734, I.A.F.F. et al.**

**MAYOR AND CITY COUNCIL of BALTIMORE**

**v.**

**BALTIMORE FIRE FIGHTERS, LOCAL 734, I.A.F.F. et al.**

**Nos. 1952 and 1953, Sept. Term, 1991.**

Court of Special Appeals of Maryland.

Oct. 6, 1992.

James S. Ruckle, Jr. and Laurice D. Royal, Asst. Solicitors (Neal M. Janey, City Sol., on the brief), Baltimore, for appellants.

Joel A. Smith (Abato, Rubinstein, Abato & Smith, P.A., Lutherville, Andrew H. Kahn and Kahn, Smith & Collins, P.A., Baltimore, on the brief), for appellees.

Argued before MOYLAN, ALPERT and MOTZ, JJ.

MOTZ, Judge.

In each of these consolidated actions, appellees, Baltimore Fire Fighters, Local 734, and Baltimore Fire Officers, Local 964 ("the Unions"), sought a declaratory judgment and injunction to compel appellants, Mayor and City Council of Baltimore ("the City"), to arbitrate a dispute between the parties. One case involves a dispute as to reduction in staffing levels on fire engines (the "staffing" case), and the other involves employees' right to use accrued vacation leave prior to retirement (the "accrued leave" case). Because both disputes are grievances and neither is so intimately involved in management prerogatives as to render it nonnegotiable, we affirm the grant of summary judgment by the Circuit Court for Baltimore City (Byrnes, J.).

(i)

The staffing case arises from a June 1, 1990 decision by the Board of Fire Commissioners ("Fire Board") to reduce the engine company crews from four to three members. The crew size reduction was precipitated by a work week reduction and a financial crisis. In 1988, the Unions and City agreed, in two Memoranda of Understanding ("MOU") covering fiscal years 1991 and 1992, to reduce the hours worked per week by union members from 47 hours per week to 44.4 or 44.8 hours per week. At the time of this agreement, the City and the Unions anticipated that this new work week would be implemented by the hiring of new employees. The City estimated that it would need 137 more firefighters after the work week reduction; the Unions estimated 120 more would be necessary. When this agreement was made in 1988 the City indicated that it would be unable to implement the work week reduction until June 1, 1990. One union agreed to this timetable; the other submitted it to arbitration, and the arbitrator ruled in the City's favor, stating that he "was strongly influenced by" the City's assurances "that there is no question of its intent to abide in full" with the terms of the agreement. On June 1, 1990, however, the Fire Board determined that because of a fiscal crisis (the Fire Department's overtime expenses were approaching a one million dollar deficit), it would implement the work week reduction by reducing from four to three the number of firefighters assigned to each engine, rather than by hiring more firefighters. On June 3, 1990, the Unions filed grievances alleging that the staffing reduction violated the Fire Department's Manual of Procedure, the Municipal Employee Relations Ordinance of Baltimore City, and the MOU. The Labor Commissioner of Baltimore City determined that the staffing dispute was "non-grievable" and refused to submit it to arbitration. The Unions then filed suit for a declaratory judgment and injunctive relief seeking to require the City to arbitrate the dispute. The City answered the complaint, and both parties moved for summary judgment.

Meanwhile, the City and Unions became embroiled in a dispute involving accrued vacation leave. For 25 years the accepted practice was to allow Fire Department employees to use accrued vacation leave just prior to their retirement. During negotiations of the MOU governing fiscal years 1991 and 1992, the City had proposed that employees be allowed to so use "only one year accumulated vacation in combination with 90 days [terminal] leave; proper payment will be made for all other accumulated vacation [leave]." This proposal was rejected by the Unions. On January 28, 1991, an employee filed a notice of retirement and requested 166 work days of accumulated vacation leave in accordance with past practice; this request was denied. A grievance was filed alleging that this action violated the Fire Department's Manual of Procedure and the MOU. On April 5, 1991, the Labor Commissioner was notified of the Union request for arbitration; on May 10, 1991, the Labor Commissioner determined that the issue was "non-arbitrable." (The specific dates given apply to Local 734; on different dates, Local 964 followed a virtually identical chronology and process on behalf of two of its members.) On June 11, 1991, the Unions then filed suit for declaratory and injunctive relief seeking to have the City ordered to arbitrate the accrued leave issue. The Unions' complaint was accompanied by a motion for summary judgment; the City answered and filed a cross-motion for summary judgment.

On August 7, 1991, the Unions moved to consolidate the staffing case and accrued leave case. That unopposed motion was granted. After hearing argument, the circuit court issued a comprehensive twenty-seven page opinion and order granting the Unions' motions for summary judgment. The circuit court found that both disputes were "grievable as a matter of law" and should be submitted to arbitration. The circuit court, however, concluded that the arbitrator was not free in the staffing case to order, "as an arbitrated remedy a return to the four person staffing level without the express consent of the Mayor and City Coun-

cil"; the Unions do not appeal this limitation on the arbitrator's power.[1]

The City does appeal the grant of summary judgment to the Unions, asserting that:

1. Neither dispute is a "grievance" as that term is defined in the MOU, the negotiated agreements between the parties; and

2. Even if the disputes are grievances, as defined in the MOU, they involve "management rights" which "may not be divested absent statutory authority" and there is no such authority here.[2]

### (ii)

In the MOU, a multi-stage grievance and arbitration procedure is specified; the parties agree to submit to an arbitrator "grievances" not satisfactorily resolved at earlier stages. "Grievance" is defined in the governing MOU and in the Municipal Employee Relations Ordinance, Baltimore City, Md.Code, art. 1, § 120(f) (1983) (hereinafter "Baltimore City Code") as:

---

**1.** The court below reasoned that the *"consequence* of the reduced manning level" was grievable and arbitrable but "because it so directly impacts on the legislative discretion of the City ... the arbitrator is not free to *order"* a return to the prior manning level. (emphasis in original.) *Compare City of Philadelphia v. Pennsylvania Labor Relations Bd.,* 138 Pa.Cmwlth. 113, 588 A.2d 67, 70–72, *appeal denied,* 528 Pa. 632, 598 A.2d 285 (1991) (City did not have to bargain as to decision to implement first responder program in fire department but did have to bargain as to effects of implementation of program).

**2.** Although the City, in one of its briefs, asserts that the "facts" set forth in the Fire Chief's affidavit "preclude summary judgment" for the Unions, actually, these "facts" (*e.g.,* the MOU and regulations contain no "provisions requiring approval of vacation leave usage" and this is an "exclusive right of management") are not facts at all but conclusions of law. The City does not assert that any dispute as to true material facts prevents a grant of summary judgment; its only claims are that the circuit court erred as a matter of law in various respects. Thus, in another portion of one of its briefs, the City specifically asserts "there is no dispute as to the facts in the instant matter."

(1) a dispute concerning the application or interpretation of the terms of a memorandum of understanding, [or]

(2) a claimed violation, misinterpretation or misapplication of the rules or regulations of a municipal agency or the employer affecting the terms and conditions of employment.

The City's initial argument is that neither dispute at issue here fits "within [this] definition of 'grievance' "; the Unions assert that both disputes are grievances as defined in the MOU.

██ Where, as here, the parties are "in disagreement on the very question whether there exists an agreement to arbitrate the subject matter of the dispute," the resolution of that question is for the court. *Messersmith, Inc. v. Barclay Townhouse Assoc.*, 313 Md. 652, 661, 547 A.2d 1048 (1988) *(quoting with approval Mayor & City Council of Baltimore v. Baltimore Fire Fighters, Local 734,* 49 Md.App. 60, 65–66, 430 A.2d 99, *cert. denied,* 291 Md. 771 (1981))*. See also United Steelworkers of Am. v. Am. Mfg. Co.,* 363 U.S. 564, 567–78, 80 S.Ct. 1343, 1346–47, 4 L.Ed.2d 1403 (1960). Although unacknowledged by any party, the definition of grievance in the MOU at issue here is "not . . . 'extremely broad' but is limited by the terms of" the MOU and "the rules and regulations of the employer." *Mayor & City Council of Baltimore v. Fire Fighters, Local 734, supra,* 49 Md.App. at 69, 430 A.2d 99 (interpreting identical language). *Compare Gold Coast Mall v. Larmar Corp.,* 298 Md. 96, 104, 468 A.2d 91 (1983). On the other hand, as the City properly concedes, the Supreme Court has made it clear that arbitration is a favored remedy, and in reviewing any arbitration clause a court is to order arbitration unless "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT & T Technologies, Inc. v. Communications Workers of Am.,* 475 U.S. 643, 650, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648 (1986). Doubts are to be "resolved in favor of coverage." *Id. See Howard Co. Bd. of*

*Educ. v. Howard Co. Educ. Ass'n,* 61 Md.App. 631, 641, 487 A.2d 1220 (1985); *Mayor & City Council of Baltimore v. Baltimore City Fire Fighters,* 49 Md.App. at 66, 430 A.2d 99; *Corvallis School Dist. v. Corvallis Educ. Ass'n,* 35 Or.App. 531, 581 P.2d 972, 974 (1978); *West Fargo Pub. School Dist. v. West Fargo Educ. Ass'n,* 259 N.W.2d 612, 620 (N.D.1977); *Iowa City Community School Dist. v. Iowa City. Educ. Ass'n,* 343 N.W.2d 139, 141 (Iowa 1983).

■ With these principles in mind, we turn to determination of whether the disputes at issue here constitute "grievances" subject to arbitration under the MOU. The Unions assert that the staffing reduction dispute "concerns" an "application or interpretation," and indeed constitutes a violation of Article IX (Overtime) and Article XV (Safety and Health) of the MOU.[3] Article IX of the MOU provides in pertinent part:

The Employer shall not vary or rearrange work schedules to avoid the payment of overtime.

Article XV provides in pertinent part:

The Employer and the Union shall cooperate in the enforcement of safety. Should any employee feel that his work requires him to be in unsafe or unhealthy situations, the matter shall be considered by the Employer. If the matter is not adjusted satisfactorily, it may become the subject of a grievance and will be processed according to the grievance procedure.

---

**3.** The Unions also assert that the staffing reduction violated the "60 series of the Department's Manual of Procedure" and the "Municipal Employee Relations Ordinance of Baltimore City (Baltimore City Code Art. I Sect. 119, *et seq.*)." Neither in this Court nor in the court below, did the Unions in any way expand upon or elucidate their assertion of alleged violations of the Manual of Procedure or the Employee Relations Ordinance. Accordingly, it is impossible for us to evaluate these claims. In addition, the Unions also assert that the staffing reduction violates Article I (Declaration of Principle, Policies and Purpose), Article VIII (Hours of Work) and Article XVI (Savings Clause) of the MOU. In light of our conclusion with regard to Articles IX and XV, we need not reach these claims.

The circuit court found, *inter alia,* that the staffing reduction might involve an application or interpretation of both of these clauses. That finding appears to be clearly correct. It may be, as the City asserts, that the "benefit claimed" by the Unions, *i.e.,* the right to continuance of four-member engine companies, is "specified nowhere in" the MOU. That, however, does not mean a dispute as to that benefit is not a "grievance." Rather, the dispute is a grievance if it cannot be said with "positive assurance" that it does not "concern" the "application or interpretation of the terms" of the MOU. *AT & T Technologies, supra,* 475 U.S. at 650, 106 S.Ct. at 1419. *See City & County of Denver v. Denver Firefighters,* 663 P.2d 1032, 1040 (Colo. 1983) ("[o]n its face," dispute "is arbitrable because it requires interpretation and application" of term of collective bargaining agreement). There was uncontroverted evidence in the record (the minutes of the Fire Board) that one of the costs sought to be avoided by implementation of the staffing reduction was substantial overtime expenses. Moreover, as the Circuit Court remarked, "a factual case could be made that there is an enhanced risk to health and safety by reason of the changed" circumstances, *i.e.,* the staffing reduction. Thus, since it cannot be said with "positive assurance" that the staffing dispute does not "*concern* " the "application or interpretation" of Articles IX or XV, it constitutes a "grievance" under the MOU.

▮ As to the accrued leave decision, the Unions assert that it concerns an "application or interpretation" of Articles XVI, XXX and XXXII of the MOU and a violation of the Department Manual of Procedure (M.O.P.) Policies 322 and 366–5. Article XXX generally deals with vacation leave; Article XXXII deals with other leave and provides in pertinent part that:

... all employees shall receive ninety (90) days leave with pay just prior to retirement.

Neither provision enunciates the undisputed past practice of permitting employees to use accrued vacation leave just

prior to their retirement. Article XVI of the MOU, however, provides:

> All *privileges, benefits, and rights, presently enjoyed by employees* covered by this Memorandum which are not specifically provided for or abridged in this Memorandum, such as, but not limited to holidays, uniforms, equipment, etc., *are hereby included in and protected by this Memorandum.*

(emphasis added.) Moreover, M.O.P. Policy 366–5 provides in pertinent part:

> *Members contemplating retirement* may convert to cash their unused leave authorized at the time of retirement or *will be allowed to take their earned vacation and personal leave in accordance with established procedures.*
>
> \* \* \* \* \* \*
>
> *Conversion* of unused leave [to cash] *is not compulsory.*

(emphasis added.) *See also* M.O.P. Policy 322–1 ("Employees have the *option* of converting vacation leave to cash at termination"). (emphasis added.) In light of the uncontroverted evidence that the accepted past practice was to permit Fire Department employees to use accrued leave just prior to retirement, it seems too clear to require extended discussion that the accrued leave dispute may well concern an "application or interpretation" of Articles XVI, XXX and XXXII of the MOU and a "claimed violation" of M.O.P. Policies 366–5 and 322–1. Accordingly, it too is a grievance under the MOU.

So that there can be no mistake, we reiterate that we are only holding that the staffing dispute and accrued leave dispute constitute grievances under the MOU. This is not a holding that either or both disputes constitute meritorious grievances or that either or both decisions violated the MOU or M.O.P. Policies. We emphasize this because the essence of the City's argument on this point is that the Unions' claims are not meritorious, *i.e.,* the Unions have not demonstrated any "right" to the benefits they claim. This

is an argument to be made to the arbitrator; it is not a consideration in determining whether a dispute is arbitrable.

(iii)

Alternatively, the City argues that, even if the staffing and accrued leave disputes are grievances, they are not arbitrable because they involve "management rights" that "may not be divested absent statutory authority" which, the City asserts, is absent here.

It should be noted at the outset that even in the private sector certain "management rights" are retained by the employer. *See, e.g., United States Steel Corp. v. Nichols,* 229 F.2d 396, 399–400 (6th Cir.), *cert. denied,* 351 U.S. 950, 76 S.Ct. 846, 100 L.Ed. 1474 (1956). When a municipality or government agency is the employer, these "management" rights are even more jealously guarded. *See Arrowhead Pub. Serv. Union v. City of Duluth,* 336 N.W.2d 68, 71 (Minn.1983) ("Without question decisions concerning a city's budget, its programs and organizational structure, and the number of personnel it employs to conduct its operations are matters of [managerial] policy ... [which] it is not required to negotiate ... although it may do so voluntarily"). *See also West Irondequoit Teachers Ass'n v. Helsby,* 35 N.Y.2d 46, 358 N.Y.S.2d 720, 723, 315 N.E.2d 775, 777 (1974) (determination of class size is nonnegotiable management prerogative). This is so because, while in the private sector, "collective bargaining is the only instrument through which employees can have any effective voice in determining the terms and conditions of employment.... public sector employees ... as citizens" already have a voice in such matters and public employers only have a duty to bargain as to those "decisions where [a] larger voice is appropriate." C.W. Summers, *Public Employee Bargaining: A Political Prospective,* 83 Yale L.J. 1156, 1193 (1974). Moreover, while a private employer can bargain away whatever prerogatives it deems appropriate, a "citizen's right to participate in governmental decisions cannot be bargained away" by the public employer. *Id.*

Baltimore City, Md. Charter, art. VII, § 45 (herein after Baltimore City Charter) creates the Fire Department, headed by the Board of Fire Commissioners. The Board is given the power to appoint a Chief of the Department and other employees. The Charter also expressly provides:

The Board shall have control, regulation and supervision of the Department, the personnel and properties thereof and all matters relating to the same.

*Id.* The City maintains that this power "clearly encompasses the specific power to hire or fire, determine the mission of the Department, and determine how many individuals may be required to carry out the mission, or to perform a given task" and that nothing in the MOU, "the Municipal Employee Relations Ordinance or the Baltimore City Charter ... abridges this authority." [4]

Article II, Section 55 of the Charter provides:

The Mayor and City Council of Baltimore are authorized *consistent with the provisions of the Charter of Baltimore City,* to submit to binding arbitration any dispute arising from the interpretation of, or application of any collective bargaining agreement with an exclusive representative.

(emphasis added.) The Municipal Employee Relations Ordinance, Baltimore City Code art. 1, § 123 provides:

*Notwithstanding any other provision contained herein, it is the exclusive right of the employer* [5] *to determine the mission of each of its constituent agencies,* set

---

**4.** Thus, the City does *not* claim that *only* another provision of the Charter itself could "abridge" the Fire Board's power under Article VII, Section 45. *Compare Anne Arundel Co. v. Fraternal Order of Anne Arundel Detention Officers and Personnel,* 313 Md. 98, 110, 543 A.2d 841 (1988). Such a claim would appear to be doomed to failure. *See Anne Arundel Co., supra,* 313 Md. at 113–14, 543 A.2d 841. Moreover, Baltimore City charter art. II, § 55 (quoted in text above) expressly limits, if not abridges, the grant of power to the Fire Board in Article VII, § 45.

**5.** Employer is defined as "the Board of Estimates or any agency of the Mayor and City Council of Baltimore other than the City Council." Baltimore City Code, Art. 1, § 120(e) (footnote added).

standards of services to be offered to the public, and exercise control and direction over its organization and operations. It is also the right of the employer to direct its employees, to hire, promote, transfer, assign or retain employees in positions within an agency and in that regard to establish reasonable work rules. It also retains the right to suspend, demote, discharge or take any other appropriate disciplinary action against its employees for just cause, and in accordance with the provisions relating to Civil Service of employer's Charter and other applicable laws; *or to relieve its employees from duty in the event of lack of work, funds, or for other legitimate reasons. The provisions of this section shall be deemed to be a part of every memorandum of understanding reached between the employer and an employee organization* provided, however, that nothing contained in this section shall be deemed to deny the right of any employee to submit a grievance as defined in Section 120(f)(2) hereof.

*Any memorandum of understanding reached between the employer and employee organization shall be subject to the provisions of the Charter or applicable ordinance concerning salaries, hours of work, fringe benefits, pensions and other conditions of employment.* (emphasis added.) The MOU provides that "[s]ubject to the provisions of this Memorandum, the Employer shall have all of the rights set forth in Article I, Section 123 of the Baltimore City Code ... and Article VII, Section 45 of the Baltimore City Charter." [6]

The City relies on the language emphasized above to argue that: (1) all decisions as to the "control and regula-

---

**6.** The court below noted the lack of clarity engendered by the fact that the MOU management rights clause, by its terms, makes management rights articulated in the City Code and Charter "subject to the provisions" of the MOU. In light of the fact that the City Code expressly provides that a MOU is subject to the Code and Charter, notwithstanding the unclear language in the MOU itself, this appears to be what was intended. The Unions do not argue to the contrary.

tion of Fire Department personnel" are vested by the Charter in the Fire Board and are not negotiable or arbitrable; and (2) the staffing and accrued leave decisions at issue here are decisions as to control and regulation of the Department and so cannot be negotiated or arbitrated.

The Unions, in contrast, rely on the language in Article II, Section 55 of the Charter which authorizes "the City to provide ... the procedure for the negotiation of a collective bargaining agreement with respect to terms and conditions of employment" and further authorizes the City "to submit to binding arbitration *any* dispute arising from the interpretation of or application" of an MOU. (emphasis added.) The Unions also rely on two portions of the Baltimore City Code. They point out that Article I, Section 123 provides that "nothing contained in this section shall be deemed to deny the right of any employee to submit a grievance" and that Article I, Section 120(k) defines "terms and conditions of employment" as "salaries, wages, hours and other matters relating to employee benefits and *duties,* such as, but not limited to, holidays, pensions and *vacations.*" (emphasis added.) The Unions argue that both the staffing and accrued vacation disputes involve "terms and conditions of employment" as to which the Charter authorizes labor agreements, negotiation, and arbitration.

The problem with both the City's and the Unions' arguments is that each proves too much—and too little. Under the City's rationale, every decision involving the control, regulation, and supervision of Fire Department personnel— that is, virtually every employment decision involving the Fire Department—is a management prerogative that is not negotiable. Under the Unions' theory, every decision involving any "term or condition of employment"—again virtually every employment decision involving the Fire Department—is subject to negotiation and arbitration. Since there are express provisions in the City Charter (Art. II, § 55) and City Code (Art. 1, § 123) permitting binding arbitration of certain collective bargaining disputes between the City and the firefighters, this is not a case in which there is no

"legislative authority" for collective bargaining and arbitration.[7] Indeed, although the City argues to the contrary, it also backhandedly concedes as much by asserting that the Fire Board "may not delegate its power, and may not negotiate or arbitrate those issues *which fall outside of the four corners of the respective Memoranda of Understanding with the Unions.*" (emphasis added.) Thus, at least implicitly, the City acknowledges that those issues which "fall" within "the four corners" of the MOU can be negotiated and arbitrated. Similarly, although the Unions staunchly maintain that the staffing and accrued leave disputes are "well within" the scope of the issues that the City has agreed to negotiate and submit to binding arbitration, the Unions also appear to concede that there are certain management rights that the City (or Fire Board) has not agreed to negotiate or arbitrate. For example, the Unions assert that the "subject matter of the grievance[s] does not impermissibly interfere with the exercise of a well defined governmental interest," implicitly admitting that grievances that do "interfere" with "well defined governmental interests" are "impermissible." Hence, even the Unions apparently concede that there are "management prerogatives" that the City or Fire Board has not, indeed cannot, delegate away.

In sum, although the City and the Union each stake out extreme positions, upon analysis it is clear that all parties concede some issues are subject to negotiation and arbitration—and some issues, involving management prerogatives, are not. The Court of Appeals' reasoning in *Montgomery Co. Educ. Ass'n Inc. v. Bd. of Educ. of Montgomery Co.*, 311 Md. 303, 534 A.2d 980 (1987), confirms that this concession is appropriate. There, a similar question was presented in the context of the argument of the teachers' union

---

**7.** Thus, the City's reliance on such cases as *Mugford v. City of Baltimore*, 185 Md. 266, 270–71, 44 A.2d 745 (1945); *City of Baltimore v. Am. Fed'n of State, Co. & Mun. Employees*, 281 Md. 463, 468, 379 A.2d 1031 (1977); and *City of Rocky River v. State Employment Relations Bd.*, 39 Ohio St.3d 196, 530 N.E.2d 1 (1988) is misplaced.

that the local school board be required to negotiate decisions as to school calendar and job classifications. The Court carefully examined the statutes governing the powers and duties of local school boards. It noted that, although local boards were required, pursuant to Md. Educ. Code Ann. § 6–408(b)(1), to negotiate "all matters" relating to "salaries, wages, hours, and or other working conditions," they were also expressly given the power, pursuant to Md. Educ.Code Ann. § 4–107(3), to determine educational policy. 311 Md. at 315, 534 A.2d 980. Since, pursuant to Md. Educ.Code Ann. § 6–411(a), the duty to negotiate was not to "supercede" other duties, the Court concluded that matters relating to "working conditions" were "negotiable" and "matters of educational policy were not." *Id.* The Court recognized that the line between the two was not "clear" but found the State Board of Education's balance of the "interests of employees against the interests of the school system as a whole" not "unreasonable." *Id.* at 316, 534 A.2d 980. Accordingly, it upheld as not arbitrary or capricious the State Board's decision that both the school calendar and job classification issues were educational policy, management prerogatives, not subject to negotiation.

Here, of course, different powers and legislative provisions are at issue. The Unions claim that the management prerogatives of the local board of education are clearer and more complete than those of the Fire Board. That is true. *Compare* Md. Educ.Code Ann. §§ 4–101(a), 4–107(1), 4–107(2) and 4–204 *with* Baltimore City Charter art. VII, § 45. On the other hand, the authorization for negotiation of labor disputes is, at least arguably, broader for local education disputes than it is for disputes as to city firefighting. *Compare* Md. Educ.Code Ann. § 6–408(b)(1) *with* Baltimore City Charter art. II, § 55. Thus, in one respect, the scheme at hand appears to "favor" the Unions, *i.e.*, fewer management prerogatives; in another it "favors" the City, *i.e.*, narrower bargaining authorization. These differences are, we believe, less important than the fact that, in both schemes, it is clear that the negotiation/arbitration provi-

sions, while containing mandatory language, are not intended to displace or nullify management prerogatives. *Compare* Md. Educ.Code Ann. § 6–411(a) ("This subtitle does not supersede any other provisions of the Code") *with* Baltimore City Charter art. II, § 55 (arbitration is authorized only if "consistent with the provisions of the Charter"). Thus, although the two schemes are different, both contain clear management prerogatives; clear authorization for negotiations and arbitration of labor disputes; and the indication that the latter is not to supplant the former, but rather to complement it. The interests of the employees are to be balanced against the interest of the governmental entity, school system or firefighting system, as a whole.

There is, however, one critical distinction between the two schemes. That is, the fact that in the sphere of education, an administrative agency, with special expertise, and broad visitatorial power in the field, the State Board of Education, is given the initial power to balance the employees' interest and those of the system as a whole, while in the situation at hand there is no such administrative agency. In *Montgomery Co. Educ. Ass'n*, Judge Eldridge expressly noted that "the State Board's expertise is extremely important." 311 Md. at 318, 534 A.2d 980. We are without that expertise here. Thus, in contrast to the Court in *Montgomery Co. Educ. Ass'n*, here we cannot look to the judgment of an administrative agency with special experience, qualifications, and oversight responsibilities as to how this balance should be struck; nor is there an administrative decision that must be upheld unless "arbitrary ... or otherwise in violation of law." *Id.* at 322, 534 A.2d 980. Moreover, neither the City nor the Unions provide any bright line distinction, easily applied test, or indeed any real help as to how a court is to determine how this balance is to be struck here.

The analysis in *Montgomery Co. Educ. Ass'n*, however, does provide some guidance as to this question. The Court noted with approval that the State Board's Hearing Examiner, in determining the school calendar issue, balanced the

"slight" interest of the certain individual employees, inconvenience in planning their personal activities, against the more universal interests of parent, students and other employees in planning their activities and "the smooth operation of the school system." 311 Md. at 320, 534 A.2d 980. With regard to the job classification issue, the Court approved the Examiner's conclusions that "reevaluating duties and reevaluating salaries were 'inextricably intertwined,'" *id.* at 321, 534 A.2d 980, and so submitting such decisions to negotiation would have a "serious adverse impact on the County Board's ability to operate its school system." 311 Md. at 322–23, 534 A.2d 980. Significantly, as to both the classification and calendar issues, the Court of Appeals expressly noted the administrative record supporting the State Board's decisions. *Id.* at 320 and 323 n. 7, 534 A.2d 980. With these principles in mind, we turn to the disputes at hand.

■ The staffing dispute, like the reclassification dispute in *Montgomery Co. Educ. Ass'n,* presents the "more difficult" issue. 311 Md. at 322, 534 A.2d 980. This is so because it involves both deployment of employee resources and, thus, is an obvious management prerogative, *and* a possibly severe impact on an important working condition of affected employees (safety) and, thus, is a paradigmatic issue for negotiation. The City asserts that "to allow the Unions to ultimately determine, through an arbitration, the level of staffing would create ... chaos in the management function" similar to that foreseen by the Examiner with regard to the reclassification issue in *Montgomery Co. Educ. Ass'n,* 311 Md. at 322, 534 A.2d 980. There is, however, no record on which to base this claim in the case at hand. The Fire Chief filed two affidavits in support of the city's position in the staffing case. In neither affidavit does he state, even conclusorily, anything equivalent to the record testimony in *Montgomery Co. Educ. Ass'n, i.e.,* if the disputed issue were negotiable it would result in a "chaotic situation" for management. *See* 311 Md. at 323 n. 7, 534 A.2d 980. Nor is there any other record support for

such a finding here. In contrast, there is an uncontradicted affidavit by a union member that the staffing decision will deleteriously affect the safety of fire fighters.

The impact of the staffing decision, decreeing the number of firefighters to be assigned to a particular piece of fire equipment, unlike, for example, the impact of an order limiting the total number of firefighters on the force, does not directly affect the City budget. It is not "inextricably intertwined" with that management prerogative. *Compare Montgomery Co. Educ. Ass'n*, 311 Md. at 322–23, 534 A.2d 980. Yet, it may well more directly affect the safety of individual firefighters than would a wholesale limitation on the total number of firefighters. Accordingly, it is not a management prerogative totally preserved from negotiation, although a management decision to reduce the total number of firefighters well may be. We recognize that the distinction drawn here is somewhat amorphous, but we believe that it fairly balances the various interests at stake, *i.e.*, preserves to the City "[m]atters of greatest importance to the community at large" but subjects to collective bargaining "matters of greatest direct importance to public employees." *Montgomery Co. Educ. Ass'n*, 311 Md. at 318, 534 A.2d 980.

We note that a similar distinction has been drawn by a majority of courts to consider the question. *See, e.g., Int'l Ass'n of Fire Fighters, Local Union 1052 v. Public Employment Relations Comm.*, 113 Wash.2d 197, 778 P.2d 32, 36–37 (1989) (en banc) ("general staffing levels are fundamental prerogatives of management.... equipment staffing is not so importantly reserved to the prerogative of management"); *Portland Firefighters Ass'n v. City of Portland*, 478 A.2d 297, 298 (Me.1984) (proposal of minimum manpower for entire department not arbitrable because, unlike staffing minimum for a particular task or at the scene of the fire, it did not directly involve safety or working conditions); *Narragansett v. Int'l Ass'n of Firefighters*, 119 R.I. 506, 380 A.2d 521, 522 (1977) (proposal to increase number of firefighters on duty at given time at a

specific fire station is arbitrable because it affects workload and safety); *City of Erie v. Int'l Ass'n of Firefighters*, 74 Pa.Cmwlth. 245, 459 A.2d 1320, 1321 (1983), *appeal dismissed*, 505 Pa. 505, 481 A.2d 610 (1984) (proposal to set minimum number of firefighters per piece of equipment is arbitrable because this is a matter of safety); *Int'l Ass'n of Firefighters v. City of Scranton*, 59 Pa.Cmwlth. 235, 429 A.2d 779, 781 (1981) ("The courts that have dealt with this issue have drawn a *very* fine line in distinguishing between the total number of persons on the force (not arbitrable), and the number of persons on duty at a station, or assigned to a piece of equipment, or to be deployed to a fire (all arbitrable because they are rationally related to the safety of the firefighters)" (emphasis in original); *Int'l Ass'n of Firefighters of City of Newburgh v. Helsby*, 59 A.D.2d 342, 399 N.Y.S.2d 334, 336 (1977) ("minimum number of men that must be on duty at all times per piece of firefighting equipment" is nonnegotiable management prerogative but if there is evidence that a "certain number of men [must] be demonstrably necessary to operate a piece of equipment safely" that issue is negotiable); *Burke v. Bowen*, 49 A.D.2d 904, 373 N.Y.S.2d 387, 389 (1975), *aff'd*, 40 N.Y.2d 264, 386 N.Y.S.2d 654, 353 N.E.2d 567 (1976) (requirement of "minimum complement of fire fighters and a minimum staff per tour" not proper subject of collective bargaining agreement while "number of fire fighters to be assigned per piece of fire fighting equipment" is "mandatory subject of negotiations").

■ Determination of whether the accrued leave dispute involves a management prerogative, which cannot be negotiated, is a less difficult question. The accrued leave dispute involves less impingement on management prerogatives and possibly a more direct and severe impact on terms of employment (here the leave policy), than the staffing dispute. Again, there is no evidence in the record that any Fire Department official testified that administrative "chaos" would result if the accrued leave dispute was subject to negotiation. In his affidavit, the Fire Chief did

opine that the accrued leave decision is a management prerogative, not barred by the MOU or any MOP, and that permitting the 18 month leave requested by one fire captain would "cause a financial and operational hardship to the Department." That is a far cry from chaos in management. *Compare Montgomery Co. Educ. Ass'n,* 311 Md. at 323 n. 7, 534 A.2d 980. Virtually every time in which an employer makes a concession to employees there is some "financial" and/or "operational" hardship to the employer. Yet, the City Charter specifically provides that certain labor disputes are to be negotiated and arbitrated.

Moreover, the employees' interest here is not "slight." *Id.* at 320, 534 A.2d 980. Rather, neither the Fire Chief nor any other official disputes the assertions in the affidavits of Union members that the accrued leave decision will cause them to lose substantial pension and health benefits. Nor do they dispute the affidavit assertions that the "established procedure of allowing employees to utilize accrued vacation leave at the time of retirement has been continuously in effect for twenty-five years"; indeed, the policy "was so well established that the City sought to change it" during past collective bargaining negotiations. In sum, the accrued leave decision, a subject of intense and direct special interest to employees, is not so inextricably tied to management prerogatives as to preclude its negotiation. *See Oberle v. City of Aberdeen,* 470 N.W.2d 238, 246–47 (S.D.1991) (change in well established past practice permitting employees to trade duty time was negotiable); *Portland Fire Fighters Ass'n v. City of Portland,* 305 Or. 275, 751 P.2d 770, 773–75 (1988) (en banc) (vacation scheduling policy limiting number of firefighters allowed to take vacation on particular day was negotiable); *City of Riverview v. Lieutenants & Sergeants Assoc.,* 111 Mich.App. 158, 314 N.W.2d 463, 464 (1981) (city's exclusion of accumulated sick and vacation time from computation of retirement benefits was proper subject of negotiation).

Finally, we note that our decision as to whether the issues here involve management prerogatives, like our decision as

to whether they are grievances, is limited. We do not hold that the Unions' substantive claims are meritorious or that the MOU prevents the staffing or accrued leave decisions at issue here, or even that these issues do not involve some element of management prerogative. Rather, we simply hold that these grievances do not involve such undiluted management prerogatives as to prevent any negotiation as to them.

JUDGMENTS AFFIRMED.

COSTS TO BE PAID BY APPELLANTS.