702 A.2d 760

**Matthew John HYLE**

v.

**MOTOR VEHICLE ADMINISTRATION.**

**No. 124, Sept. Term, 1996.**

Court of Appeals of Maryland.

Nov. 20, 1997.

Christopher M. Marts, Charles E. Chlan & Associates, L.L.C., Bel Air, on brief, for petitioner.

John S. Hyle, Jarvis and Hyle, Ocean City, on brief, for petitioner.

Dore J. Schwartz, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for respondent.

Argued before BELL, C.J., ELDRIDGE, RODOWSKY, CHASANOW, RAKER and WILNER, JJ., and ROBERT L. KARWACKI, Judge (retired), Specially Assigned.

CHASANOW, Judge.

In the instant case, we are called upon to determine whether it is proper to suspend a licensee's driver's license for refusing to take a blood test for alcohol concentration pursuant to Maryland Code (1977, 1992 Repl.Vol., 1997 Supp.), Transportation Article, § 16–205.1(b)(1)(i)2.A,[1] where the licensee agrees to take a breath test and the apparatus for administering the test is available, but no qualified person is available to administer the breath test. The resolution of this issue turns on a determination of whether the term "equipment" as used in Md.Code (1974, 1995 Repl.Vol.), Courts and Judicial Proceedings Art., § 10–305(a)(3),[2] the section specifying the type of test to be administered under § 16–205.1, includes a qualified person (or "technician") to administer the test. For the following reasons, we cannot construe the term equipment so broadly and, therefore, hold that a licensee's driver's license should not be suspended under those circumstances.

In the early morning hours of January 25, 1996, Petitioner, Matthew John Hyle, was stopped by Police Officer Andrew Wheeler and Police Officer Trainee William P. Hoover[3] after Hyle was observed crossing the double yellow lines and running a red light. Upon questioning, Hyle admitted that he had had a couple of drinks. It was also noted that Hyle had a moderate odor of alcohol. Hyle was then given a variety of field sobriety tests, including the one leg stand, the walk and turn, and the horizontal gaze nystagmus test. After performing unsuccessfully on the horizontal gaze nystagmus test, Hyle was arrested on suspicion of driving while intoxicated and

---

**1.** Unless otherwise indicated, all references to § 16–205.1 will be from Maryland Code (1977, 1992 Repl.Vol., 1997 Supp.), Transportation Article.

**2.** Unless otherwise indicated, all references to §§ 10–302 through 10–309 will be to Md.Code (1974, 1995 Repl.Vol., 1997 Supp.), Courts & Judicial Proceedings Art.

**3.** At the time Hyle was stopped, then Officer Trainee William P. Hoover was being trained by Officer Andrew Wheeler.

transported to the Central District Police Station in Baltimore City.

At the police station, Hyle was given, but refused to sign, a DR–15 Advice of Rights Form informing him of the possibility that his license would be suspended if he submitted to a test for alcohol and was found to have an alcohol concentration of 0.10 or more, or if he refused to take such a test. Hyle then agreed to submit to a breath test. Because no technician was available to perform the breath test, however, Hyle was informed that he would be transported to Mercy Hospital for a blood test. Hyle refused. As a consequence of this refusal, Hyle's license was suspended for 120 days as provided for in § 16–205.1(b)(1)(i)2.A.

Hyle then requested an administrative hearing regarding the proposed suspension. The administrative law judge (ALJ) upheld the suspension. After finding that the officers had reasonable grounds to make the stop, the ALJ determined that there was no technician available to take a breath test from Hyle and that this amounted to the equipment being unavailable under § 10–305(a)(3). The ALJ further concluded that Hyle's failure to submit to a blood test for alcohol constituted a "refusal" to submit to a test for alcohol pursuant to § 16–205.1. The ALJ, therefore, found that Hyle's license had properly been suspended. On appeal, the Circuit Court for Worcester County affirmed the ALJ's decision to uphold the suspension. Hyle then petitioned this Court for a writ of certiorari, which we granted on February 14, 1997. For the reasons set forth below, we shall reverse the judgment of the circuit court.

Under § 16–205.1(a)(2), Maryland's "implied consent" law, a person who drives on a highway or private property used by the public in Maryland is deemed to have impliedly consented "to take a test if the person should be detained on suspicion of," *inter alia,* driving under the influence of alcohol or driving while intoxicated. Section 16–205.1(b)(1)(i)2 provides for the suspension of a driver's license where the driver refuses to submit to a chemical test for alcohol. Section 10–305, the

statute at issue in this case, is part of a comprehensive statutory scheme "to regulate evidentiary procedures in drunk driving cases." *Willis v. State*, 302 Md. 363, 371, 488 A.2d 171, 176 (1985). Other sections within this scheme include § 10–303(a)(2), which provides that if a chemical test for alcohol is to be given it must be administered within two hours after the driver's apprehension. In addition, § 10–304(b) states that a "test of breath shall be administered by a qualified person with equipment approved by the toxicologist." Section 10–304(a)(3) defines a "qualified person" for administering a test as one "who has received training in the use of the equipment in a training program approved by the toxicologist." Section 10–304(e) also provides that "[t]he person tested is permitted to have a physician of the person's own choosing administer tests in addition to the one administered at the direction of the police officer." Section 10–305, specifies which type of test should be administered. Sections 10–306 to 10–308, not relevant here, discuss the admissibility of evidence obtained from a chemical test for alcohol. Finally, § 10–309(a) specifies that the test discussed in § 16–205.1 is not compulsory and that "[n]o inference or presumption concerning either guilt or innocence arises because of [a] refusal to submit."

There are two types of tests: a breath test and a blood test. § 16–205.1(a)(1)(iii). As we noted earlier, these tests may only be administered by a "qualified person" using "equipment approved by the toxicologist." § 10–304(b), (c). Section 10–305(a)specifies that "[t]he type of test to be administered to the defendant . . . shall be the test of breath except" in three circumstances:

"(1) The defendant is unconscious or otherwise incapable of refusing to take a test to determine alcohol concentration; (2) Injuries to the defendant require removal of the defendant to a medical facility;  or (3) The equipment for administering the test of breath is not available."

§ 10–305(a). In the case *sub judice*, the MVA suspended Hyle's license for refusing to submit to a blood test, although

he had consented to a breath test. We must, therefore, determine whether this case falls within any of the exceptions set forth in § 10–305(a). The only exception which might be applicable in this situation is the third, "[t]he equipment for administering the test of breath is not available." § 10–305(a)(3). Thus, only if the equipment was unavailable would Hyle's refusal to take a blood test have violated § 16–205.1. The ALJ concluded that the test apparatus was available, but there was no qualified technician to perform the test. This case, therefore, turns on the meaning of the term equipment, as used in § 10–305(a)(3), and whether a qualified technician is encompassed within that definition.

"The cardinal rule of statutory construction is to ascertain and effectuate the actual intent of the [l]egislature." *State v. Loscomb,* 291 Md. 424, 429, 435 A.2d 764, 767 (1981); *accord Revis v. Automobile Ins. Fund,* 322 Md. 683, 686, 589 A.2d 483, 484 (1991) ("[U]ltimate aim [in statutory construction] is to effect the legislative intent."). To determine the legislature's intent, we must look " ' "first to the words of the statute, read in light of the full context in which they appear, and in light of external manifestations of intent or general purpose available through other evidence." ' " *Motor Vehicle Admin. v. Chamberlain,* 326 Md. 306, 314–15, 604 A.2d 919, 923 (1992) (quoting *Dickerson v. State,* 324 Md. 163, 170–71, 596 A.2d 648, 651–52 (1991), in turn quoting *Cunningham v. State,* 318 Md. 182, 185, 567 A.2d 126, 127 (1989)); *see also Loscomb,* 291 Md. at 429, 435 A.2d at 767. Moreover, we must give this language "its ordinary and common meaning." *Chamberlain,* 326 Md. at 315, 604 A.2d at 923 (quoting *Dickerson,* 324 Md. at 171, 596 A.2d at 652). We must similarly avoid strained interpretations that lead to "absurd" results. *Id.*

Here, the legislature chose the term "equipment." § 10–305(a)(3). "Equipment is defined as 'the implements used in an operation or activity.' " *318 North Market St. v. Comptroller,* 78 Md.App. 589, 597, 554 A.2d 453, 457 (1989) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY ); *accord Holtz v. Babcock,* 143 Mont. 341, 389 P.2d 869, 874 (1963)

(quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY). The term equipment is also synonymous with apparatus, machinery, paraphernalia, and gear. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED, at 768 (Philip B. Gove ed., 1986). Thus, the term equipment, on its face, would seem to encompass the apparatus or machine used to test for alcohol levels and not the qualified technician necessary to administer the test.

Moreover, we have been unable to find, and the MVA failed to point out, any statutory use of the term equipment which encompasses a person trained to use that equipment. *See, e.g., State Tax Comm. v. Whitehall,* 214 Md. 316, 324, 135 A.2d 298, 302 (1957) (quoting with approval the trial court in the same case, in turn quoting WEBSTER'S) ("'Webster defines "equipment" as "whatever is used in equipping"'"); *Abbott v. Temple,* 73 So.2d 647, 650 (La.Ct.App.1954) (quoting with approval the trial court in the same case, in turn quoting WEBSTER'S COLLEGIATE DICTIONARY) ("' "Equipment" is defined to mean "anything used in equipping."'"); *Polliak v. Smith,* 19 N.J.Super. 365, 88 A.2d 351, 353 (Ch. Div.1952) (citing FUNK & WAGNALLS' NEW STANDARD DICTIONARY OF THE ENGLISH LANGUAGE (1937), which defines equipment as "the act or process of equipping with all needful supplies for any special service"). Personnel, in fact, have been excluded from the definition of equipment. "[E]quipment usually covers everything, *except personnel,* needed for the efficient operation or service...." *Holtz,* 389 P.2d at 874 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY) (emphasis added).

In interpreting a statute, "we construe the statute as a whole, interpreting each provision of the statute in the context of the entire statutory scheme." *Blondell v. Baltimore Police,* 341 Md. 680, 691, 672 A.2d 639, 645 (1996). Furthermore, we must avoid "constructions that render any portion of the language superfluous or redundant." *Blondell,* 341 Md. at 691, 672 A.2d at 644. Sections 10–302 through 10–309 and § 16–205.1 are "integrally interrelated" and "must be

construed harmoniously in order to give full effect to each." *Loscomb,* 291 Md. at 432, 435, 435 A.2d at 768, 770.

To construe equipment to include a qualified technician, as the MVA urges us to do, would render parts of §§ 10–302 through 10–309 nonsensical and others redundant. *See Montgomery County v. Buckman,* 333 Md. 516, 523–24, 636 A.2d 448, 452 (1994) ("[A]bsent clear intent to the contrary, a statute is to be read so that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless, or nugatory."). For example, it makes little sense to speak of a qualified person as having received training on the use of a qualified person. *Cf.* § 10–304(a)(3) (defining qualified person as one who has "received training in the use of the equipment"). Moreover, such a reading would make subsections (a)(3) and (b) of 10–304 repetitive. Subsection (b) states that the equipment used for the breath test must be approved by the toxicologist. If a qualified person were encompassed in the definition of equipment, subsection (a)(3), stating that a qualified person is one who "has received training in the use of the equipment in a training program approved by the toxicologist," is unnecessary because under subsection (b) the toxicologist would already have to approve the qualified person. Similarly, § 10–306, which provides for the admissibility of the test results when accompanied by a report, separately requires the report to "[i]dentify the technician or analyst as a 'qualified person,' " § 10–306(a)(2)(i), and to "[s]tate that the test was performed with equipment approved by the toxicologist," § 10–306(a)(2)(ii). Under the MVA's reading, one of these would be superfluous.

Throughout §§ 10–302 through 10–309 and § 16–205.1, the legislature has amply demonstrated its ability and willingness to use terms such as equipment and qualified person distinctly. *See, e.g.,* § 10–304. Under § 10–304, for example, both the blood and breath tests must be administered by a "qualified person" on "equipment approved by the toxicologist." § 10–304(b), (c)(1)(i). Qualified person is defined as "a person who has received training in the use of the equipment." § 10–305(a)(3). Similarly, § 16–205.1(g), which allows a person to

withdraw an initial refusal to take a test, lists as one of the factors to consider in determining whether the initial refusal has been validly withdrawn as "[w]hether a qualified person ... to administer the test and testing equipment were readily available." § 16–205.1(g)(3)(ii).

This last example evidences that the legislature had at least contemplated the possibility that a technician might not be available. Given the legislature's demonstrated awareness of the distinction between equipment and the personnel needed to operate the equipment, the legislature could easily have provided in § 10–305 that the blood test should be administered when either the equipment *or a qualified person* "for administering the test of breath is not available." It also is important to note that the statute does not provide an exemption where the "test" is unavailable, but instead uses the specific term "equipment." Whether a qualified person is available to operate the equipment does not affect the equipment's availability, but rather only affects the availability of the test. While it is possible to say that the test cannot be administered without a qualified person and, thus, without a qualified person the "test" is unavailable, the same cannot be said with respect to equipment. Even if we were to find that the term equipment is ambiguous, the legislative history of this section leads us to the conclusion that equipment was not meant to encompass a police officer. Thus, in ascertaining what the legislature meant by equipment, we next turn to the legislative history of § 10–305. *See generally, e.g., Loscomb,* 291 Md. at 429, 435 A.2d at 767 ("When statutory language is ambiguous, a court may consider a statute's legislative history and must consider its purpose.").

Prior to a 1983 amendment, § 10–305 permitted the defendant to choose whether to take a blood test or a breath test. Chapter 289 of the Acts of 1983. Concern arose regarding the increasing number of defendants choosing blood tests over breath tests because of: (1) the difficulty of accomplishing the blood test in certain situations; (2) the delay in processing caused by administering blood tests instead of breath tests; and (3) the problems caused by the necessity to have medical

personnel attend hearings where a blood test was used.[4] *See, e.g.,* Testimony of [then] Lieutenant Governor J. Joseph Curran, Jr., before the Senate Constitutional and Public Law Committee (Senate Bill 513) and the House Judiciary Committee (House Bill 885); Summary of Committee Report, Part III, of the Senate Constitutional and Public Law Committee, Senate Bill 513 of 1983; Maryland Department of Transportation, Position on Proposed Legislation on Senate Bill 513 (February 23, 1983). When § 10–305 was being amended, it originally called for the police officer to select the type of test. Ch. 238 of the Acts of 1983. As originally drafted, the bill read: "The defendant's failure to take the test selected by the police officer is a refusal to take the test, ... unless failure to take the test is due to facilities or equipment not being available for the administration of the test." *Id.* The purpose was originally stated as follows: "FOR the purpose of permitting the police officer to select the type of test for alcohol or drugs to be administered to a defendant...." *Id.* This version, however, did not pass. In fact, "[t]he bill failed 28–17 after a number of senators complained that it would give too much discretion to law enforcement officers and harm motorists' rights." Tom Linthicum, *Bill to tighten intoxication tests given new life,* BALTIMORE SUN, March 16, 1983, at F14.

The version that ultimately passed eliminated officer discretion with respect to the type of test to be administered, and instead statutorily determined which type of test would be administered: "FOR the purpose of designating the type of test for alcohol or drugs to be administered to a defendant under certain circumstances...." Ch. 289 of the Acts of 1983. The final version stated that the breath test would be the test

---

4. In a letter to then-Governor Harry Hughes regarding Senate Bill 513, Timothy E. Clarke, Deputy State's Attorney, Montgomery County, stated, in 1982 alone, 338 of the 3,155 defendants arrested in Montgomery County for driving while intoxicated or under the influence of drugs or alcohol requested blood rather than breath tests. Of these 338, "no more than one or two of those test results were admitted in a trial," and these exceptions were admitted only because "the defendant failed to demand the presence of the necessary witnesses."

to be administered, but carved out three exceptions including the one at issue in this case.

In enacting this legislation, the legislature did not altogether ban the use of blood tests, but did express a clear preference for breath tests while severely restricting situations where a blood test could be used. An examination of the bill file reveals that the legislature was provided with ample evidence that breath tests were preferable to blood tests. *See, e.g.,* Summary of Committee Report, Part III, of the Senate Constitutional and Public Law Committee, Senate Bill 513 of 1983 (describing one of the purposes of the bill as "prevent[ing] defendants from subverting the administration of a test, and ... aid[ing] in the prosecution of drunk driving cases by obviating the necessity of summoning medical personnel to testify at the trial of most of such cases (as is necessary when a blood test is administered")); Testimony of [then] Lieutenant Governor J. Joseph Curran, Jr., before the Senate Constitutional and Public Law Committee (Senate Bill 513) and the House Judiciary Committee (House Bill 885)(stating that blood tests are "sometimes difficult to accomplish in certain field situations" and that blood tests cause delay); Maryland Department of Transportation, Position on Proposed Legislation on Senate Bill 513 (February 23, 1983).

Furthermore, the bill file contains the NATIONAL SAFETY COUNCIL, ALCOHOL AND THE IMPAIRED DRIVER—A MANUAL ON THE MEDICOLEGAL ASPECTS OF CHEMICAL TESTS FOR INTOXICATION WITH SUPPLEMENT ON BREATH/ALCOHOL TESTS 94–97 (Chicago 1976) (MANUAL). The MANUAL sets forth the many advantages to using the breath test, including: (1) While a blood test requires laboratory facilities and thus takes longer to complete, a breath test "is obtainable within a few minutes"; (2) A breath test "accurately reflects the actual pulmonary arterial blood-alcohol level at the time of the test"; (3) Breath test specimens avoid "evidentiary safeguard problems"; (4) Breath tests require less technical training to administer; (5) The facilities required to administer a breath test are minimal; and (6) Subjects usually have less objection to the collection of breath. MANUAL, at 94–95. Furthermore, the disadvantages

of breath tests listed in the MANUAL are all diminished by specific provisions of Maryland's drunk driving laws. For example, the MANUAL states that some cooperation is necessary to administer the test. MANUAL, at 96. Maryland's statute only permits the breath test to be administered with the licensee's consent. § 10–309(a). The MANUAL also states that the test is not applicable to an unconscious person. MANUAL, at 96. Maryland's statute requiring a breath test has a specific exemption where the licensee is unconscious. § 10–305(a)(1). The MANUAL also says that a breath specimen is difficult to preserve for later independent analysis, MANUAL, at 95, so Maryland's statute specifically provides for the licensee to obtain an independent test at the licensee's discretion. § 10–304(e).

Moreover, it seems likely that the legislature recognized that a blood test is more invasive than a breath test. While the administration of a blood test to determine alcohol concentration is not constitutionally impermissible, *see, e.g., Schmerber v. California,* 384 U.S. 757, 771–72, 86 S.Ct. 1826, 1836, 16 L.Ed.2d 908, 920 (1966); *State v. Moon,* 291 Md. 463, 473, 436 A.2d 420, 425 (1981), the Supreme Court has recognized the invasiveness of administering a blood test. *See, e.g., Schmerber,* 384 U.S. at 767–70, 86 S.Ct. at 1834–35, 16 L.Ed.2d at 918–19. Such blood tests implicate the Fourth Amendment. *See, e.g., Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 616, 109 S.Ct. 1402, 1412, 103 L.Ed.2d 639, 659 (1989); *Schmerber,* 384 U.S. at 767, 86 S.Ct. at 1834, 16 L.Ed.2d at 918; *Mills v. State,* 28 Md.App. 300, 305, 345 A.2d 127, 131 (1975), *aff'd,* 278 Md. 262, 363 A.2d 491 (1976). In *Schmerber,* the Supreme Court upheld the constitutionality of using blood tests without a warrant to test blood-alcohol level. 384 U.S. at 771–72, 86 S.Ct. at 1836, 16 L.Ed.2d at 920. The Supreme Court, however, specifically limited that holding to the facts of the case. *Id.* There, the driver had refused to consent, but the Court upheld the admission of the test results stating that the driver was "not one of the few who on grounds of fear, concern for health, or religious scruple might prefer some other means of testing, such as [a] '[B]reathalyzer.'"

*Schmerber,* 384 U.S. at 771, 86 S.Ct. at 1836, 16 L.Ed.2d at 920. The Court emphasized: "It bears repeating ... that we reach this judgment only on the facts of the present record. The integrity of an individual's person is a cherished value of our society. That we today hold that the Constitution does not forbid the States minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits ... intrusions under other conditions." *Schmerber,* 384 U.S. at 772, 86 S.Ct. at 1836, 16 L.Ed.2d at 920.

Evidence of the legislature's concern over the invasiveness of subjecting people to blood tests can be found in the legislative history of § 10–302 discussed in *Moon,* 291 Md. at 470–71, 436 A.2d at 423–24.

> "Maryland's statute relative to chemical tests to determine blood alcohol content was proposed by the Legislative Council Committee on the Revision of the Motor Vehicle Laws of the State in 1956. The committee renewed its recommendation in its report to the 1959 session of the General Assembly with an additional proviso that chemical tests could not be given if the suspected person would not agree to it. The General Assembly enacted Chapter 769 of the Acts of 1959 as Code (1957, 1959 Cum.Supp.) Art. 35, § 100. The form in which it was enacted closely followed the 1957 committee recommendation with the addition of the provisions that no person should be compelled to submit to such tests, that no inference or presumption concerning either his guilt or innocence might arise by reason of his refusal to submit to such a test, and that the fact of his refusal to so submit should not be admissible into evidence at his trial. During the statute's trip through the General Assembly, there was added the provision that the specimen of blood, breath or urine must have been taken within two hours after the person being prosecuted was first apprehended by the arresting officer." (Footnote omitted).

*Id.*

Because the legislature did not intend to rest the decision of which test to administer with police officers, we also note, as

the legislature may well have, our concern that the staffing of qualified people to administer a test is a factor far too easily manipulated.[5] The unavailability of qualified technicians is far more discretionary than the availability of the testing equipment. If this Court interpreted equipment as used in § 10–305 to encompass a qualified technician, a great deal of discretion would be given to the police. For example, a police department could schedule a trained technician only during certain hours thereby forcing defendants to submit to a blood test whenever the police department chooses not to schedule a technician for duty. A law enforcement agency that has a breath test apparatus should have sufficient officers trained in its use to assure that a qualified technician could be called in within two hours of an arrest. Since § 10–303 requires the test to be administered within two hours after the licensee is apprehended, this should be ample time for a qualified person to be called in. A decision otherwise would give the police the discretion to select a more invasive blood test over a breath test. This may be the very reason that the legislature decided to include the term "equipment" and not qualified person in § 10–305(a)(3).

In light of the plain language used in the statute, viewed in a commonsensical way, and the legislative history of § 10–305, we hold that qualified person is not encompassed within the definition of equipment. When it amended § 10–305 in 1983, the legislature clearly expressed a preference for breath tests over blood tests, while at the same time rejecting the opportunity to vest the police officer with the discretion to choose the type of test. Because the statutory conditions of § 10–305(a) were not met, Hyle was only required to do what he did, submit to a breath test, and was not required to submit to a blood test. Hyle's subsequent refusal to submit to a blood

---

5. In this very case, there is some indication that a breath test was performed on a different licensee within approximately two and a half hours of Hyle's apprehension. The ALJ, however, concluded that the technician was unavailable, and because we conclude that the availability of a technician would not have satisfied the statutory requirement that the equipment be unavailable, we need not review that decision.

test was not a violation of § 16–205.1. Thus, we reverse the judgment below.

*JUDGMENT OF THE CIRCUIT COURT FOR WORCES-TER COUNTY, MARYLAND REVERSED. COSTS IN THIS COURT AND IN THE CIRCUIT COURT FOR WORCESTER COUNTY TO BE PAID BY THE RESPON-DENT, MOTOR VEHICLE ADMINISTRATION.*