766 A.2d 219

### MAYOR AND CITY COUNCIL OF BALTIMORE

v.

### BALTIMORE CITY FIREFIGHTERS LOCAL 734, I.A.F.F., et al.

**No. 0181, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

Feb. 5, 2001.

William R. Phelan, Jr., Principal Counsel (David Leibowitz, Associate Solicitor and Adam S. Levine, Assistant Solicitor on the brief), Baltimore, for appellant.

Joel A. Smith (Andrew H. Kahn, Keith J. Zimmerman, Travis M. Mastroddi and Kahn, Smith & Collins, P.A. on the brief), Baltimore, for appellees.

Argued before EYLER, ADKINS and KRAUSER, JJ.

ADKINS, Judge.

Annually, the Mayor and City Council of Baltimore ("the City") and its various employee units engage in collective bargaining regarding terms and conditions of employment. If the City and its fire officers and firefighters (collectively, "Firefighters") cannot reach agreement through collective bargaining, they are required, under the *Baltimore City Charter* ("the Charter"), Art. II, section 55(b), to submit to binding arbitration "terms and conditions of employment." In the most recent contract year, the City and unions representing the Firefighters, *i.e.*, Baltimore City Firefighters, Local 734, I.A.F.F. and Baltimore City Fire Officers, Local 964, I.A.F.F. (collectively "the Unions"), could not agree upon either a contract or the disputes to be submitted to arbitration. We are asked to resolve the latter issue, which involves the arbitrability of two contract provisions sought by the Unions: (1) a "parity provision"—under which the Firefighters would receive pay and benefits equal to that of paid police officers; and (2) the "rule of one"—a method used to determine promotions for individual Firefighters based solely upon certain test scores. We hold that the parity provision is arbitrable. Because the record is not sufficiently developed with regard to the rule of one, however, we remand to the trial court for full resolution of that issue.

## FACTS AND LEGAL PROCEEDINGS

Under the arbitration procedures, each party submits its final "best offer" to a three-member arbitration panel("panel").[1] After a hearing on the record, the panel chooses between the competing proposals. The decision of the panel is

---

1. The arbitration panel consists of three members: one is appointed by the Mayor, one is appointed by the unions, and a third is selected "by the 2 arbitrators previously chosen and in accordance with the procedures of the American Arbitration Association from a list furnished by the Association." *Balt. City Charter*, Art. II § 55(b)(2).

final and binding, and "[n]o appeal therefrom shall be allowed." *Balt. City Charter,* § 55(b)(7).

The parties negotiated but failed to reach complete agreement on a memorandum of understanding ("MOU") for the fiscal year beginning on July 1, 2000. Specifically, there were two issues on which the parties failed to reach complete agreement. First, the Unions proposed, and the City rejected, a parity provision. Under the proposed parity provision, the City would be required to grant to Firefighters the same wage or benefit increases that it grants to police officers. According to an affidavit submitted by a former president of Local 734, parity provisions first appeared in an MOU negotiated between the City and the Unions in 1974. Between 1974 and 1992 a parity provision appeared in some, but not all, Firefighter MOU's. Since 1992, parity provisions have been included in every MOU negotiated between the City and the Unions.

The second issue involved the rule of one. The City's Civil Service Commission ("Commission") announces vacancies in City employment and conducts competitive examinations to fill vacant positions. The rule of one requires the appointing authority, in this case the fire department, to promote the individual who is ranked first on the list of eligibles. Thus, under the rule of one, the fire department's discretion in promotion is limited. Under the Commission's rules, however, the Commission submits to the fire department a list of at least five individuals to be interviewed, and the fire department fills vacancies from this finalist list, thereby preserving the discretion of the appointing authority. *See Rules of the Baltimore City Department of Personnel and Civil Service Commission,* Rule 29E.

The parties' dispute reached the Circuit Court for Baltimore City when the City, on March 3, 2000, filed a complaint for declaratory judgment and injunctive relief attempting to enjoin the arbitration. The City contended that both the proposed parity provision and the rule of one violated the City Charter and the Municipal Employee Relations Ordinance,

Baltimore City Code (1976, 1983 ed.), Art. I, sections 119–137 ("MERO"), and therefore, were "not subject to arbitration under Article II, section 55(b)(1) of the [City] Charter...." Specifically, the City asserted that the parity provision "impermissibly restrict[s] and interfere[s] with the City's ability to negotiate directly and in good faith with both the police and fire unions." Likewise, the City argued that the rule of one would interfere with the authority of, and violate the rules and regulations established by, the City's Department of Personnel ("Department") and the Commission.

On March 28, 2000, the Unions filed a motion to dismiss the City's complaint. At a hearing three days later, the court held that the question of arbitrability was not for the court to decide, but rather, for the board of arbitrators and that "a court of competent jurisdiction does not have jurisdiction until the matter is adjudicated in the arbitration." This appeal followed.

In the time period between the circuit court's dismissal and the instant appeal, the arbitration was completed. The Panel adopted the Unions' proposals, including the parity provision and the rule of one.

Additional facts will be added as necessary to the following discussion.

## DISCUSSION

### I.

### Introduction: Public Employee Collective Bargaining And Arbitration In Baltimore City

Collective bargaining for public employees began in Baltimore City in 1968 with the enactment of MERO. *See 1968 Baltimore City Ord., No. 251.* In its Declaration of Policy and Findings of Fact, MERO provides:

The City Council finds that unresolved disputes involving employees in the municipal service are injurious to the public, the municipality and municipal employees; therefore adequate means should be provided for preventing contro-

versies between the municipality and its employees and for resolving them when they occur.... [I]t is incumbent upon the municipality ... to provide orderly procedures for the participation by municipal employees and their representatives in the formulation of personnel policies and plans, to insure the fair and considerate treatment of municipal employees, to eliminate employment inequities, and to provide effective means of resolving questions and controversies with respect to terms and conditions of employment....

To that end it is necessary in the public interest that the municipal officials, municipal employees and their representatives, shall enter into negotiations with affirmative willingness to resolve grievances and differences. Municipal agencies and employees and their representatives shall have a mutual obligation to endeavor in good faith to resolve grievances and differences relating to terms and conditions of employment with due regard for and subject to the provisions of applicable laws relating to personnel policies, including hiring, promotion, suspension, discharge, position classification and fixing of compensation and any and all other laws, ordinances, and Charter provisions governing public employment and fiscal practices in the City of Baltimore.

MERO, § 119.

MERO gives to City employees the right to organize into employee organizations, and protects the exercise of that right.

Employees shall have, and shall be protected in the exercise of, the right of self-organization, to form, join, assist or participate in any employee organization, or to refrain from forming, joining, assisting or participating in any employee organization, freely and without fear of penalty or reprisal, to negotiate collectively through representatives of their own choosing on terms and conditions of employment subject to the limitations herein stated and the administration of grievances arising thereunder, subject to the applicable provisions of any law, ordinance or charter provisions relating thereto.

MERO, § 122. MERO also reserves unto the City certain rights.

> [I]t is the exclusive right of the employer to determine the mission of each of its constituent agencies, set standards of services to be offered to the public, and exercise control and direction over its organization and operations. It is also the right of the employer to direct its employees, to hire, promote, transfer, assign or retain employees in positions within an agency and in that regard to establish reasonable work rules. . . . Any memorandum of understanding reached between the employer and employee organization shall be subject to the provisions of the Charter or applicable ordinance concerning salaries, hours of work, fringe benefits, pensions and other conditions of employment.

*Id.* MERO provides for recognition and certification of employee organizations, and gives certified organizations "the exclusive right to represent all employees in the unit for the purpose of collective negotiations as described herein. . . . MERO § 124(b)". The employer and the certified employee organization have a duty "to negotiate collectively with respect to the terms and conditions of employment of employees in said unit." MERO, § 127. "Terms and conditions of employment" is defined in MERO as "salaries, wages, hours and other matters relating to employee benefits and duties, such as, but not limited to, holidays, pensions and vacations." MERO § 120(k). They are required to "reduce to a memorandum of understanding the matters agreed upon as the result of such negotiations in the event that all of the issues have been resolved." *Id.*

MERO also provides for the selection of an "Impasse Panel," consisting of three persons who would make findings of fact and recommendations for the solution of a dispute when an impasse occurs in the parties' negotiations. MERO, § 128. There was no procedure for binding interest arbitration with respect to impasses in negotiation of an MOU.[2]

---

2. Arbitration over impasses in collective bargaining is known as "interest arbitration." *See* Marlin M. Volz and Edward P. Goggin, *How*

At the time MERO was enacted, there was no public local law or Charter provision which authorized the City Council to enact MERO. Thus, the validity of MERO was subject to challenge on the grounds that Baltimore City acted outside its authority in binding itself "to exercise [its] discretionary legislative powers over compensation of public employees in a particular manner...." *Maryland Classified Employees Ass'n v. Anderson,* 281 Md. 496, 508, 380 A.2d 1032 (1977). In 1976, however, the General Assembly, by public local law, enacted Baltimore City Charter section 55(a), and later, in 1985, enacted section 55(b). *See* 1976 Md. Laws, Chap. 924; 1985 Md. Laws, Chap. 704. Since 1985, Charter section 55 of Article II has provided for collective bargaining and arbitration as follows:

(a).... [T]he Mayor and City Council of Baltimore are authorized, consistent with the provisions of the Charter of Baltimore City, to submit to binding arbitration any dispute arising from the interpretation of, or the application of, any collective bargaining agreement with an exclusive representative. Binding arbitration for firefighters and fire officers shall be conducted as provided in subsection (b).... Until amended by ordinance, the presently existing municipal employee relations ordinance shall remain in force and effect.

(b)(1) If the [Union and the City] have not reached a written agreement **concerning terms and conditions of employment** by March 1 of any year, either party may request arbitration by a Board of Arbitration, as herein provided, which request must be honored.

*Charter,* Art. II, § 55 (emphasis added). Section 55(b) also sets forth procedures for interest and grievance arbitration between the City and its employees. It is the scope of issues

---

*Arbitration Works,* 106 (5th ed.1997). Arbitration over interpretation of contractual provisions contained in an MOU is known as "grievance arbitration." *Id.* at 104. MERO does contain binding grievance arbitration. *See MERO,* § 132.

to be arbitrated under Charter section 55(b) that we must decide today.

## II.

### This Court Will Exercise Its Discretion To Review The Arbitrability Of The Parity Provision And The Rule Of One

██ Because the arbitration has already taken place, a portion of the City's request for injunctive relief—the request to halt the arbitrations proceedings—is now moot. The parties assert, however, and we agree, that some of the relief requested in the complaint is still justiciable. "A court will vacate an arbitration award if it is not within the scope of the issues submitted to arbitration." *Bd. of Educ. of Prince George's County v. Prince George's County Educators' Ass'n,* 309 Md. 85, 100, 522 A.2d 931 (1987). Thus, the justiciable issue presented for our decision is whether to vacate the arbitration award because the issues submitted to arbitration were not "terms and conditions of employment" within the meaning of Charter section 55(b).

The trial court ruled that it had no jurisdiction to determine whether the two contested issues were arbitrable. The City argues that it did have jurisdiction. The Unions respond that the arbitration had to occur first, but as it has now been completed, the arbitration award now is ripe for judicial review. Both agree that the question of arbitrability is before the court, to be decided as a matter of law.

██ We agree with the parties that it is for the court to decide whether there exists an agreement to arbitrate on the subject matter of dispute. *See City of Baltimore v. Baltimore City Fire Fighters, Local 734,* 49 Md.App. 60, 65–66, 430 A.2d 99, *cert. denied,* 291 Md. 771 (1981) (where the parties are in disagreement as to whether there exists an agreement to arbitrate, the resolution of that matter is for the courts). Although we are inclined to agree with the City that the arbitration was not required before the court could determine

arbitrability of these issues, we do not reach that issue since arbitration has now been completed.

The Unions contend that the trial court was correct in dismissing the City's complaint because the Charter calls for arbitration on all terms and conditions of employment, and the parity provision and rule of one are terms and conditions of employment. The City counters that both the parity provision and the rule of one are excluded from arbitration because all arbitration called for under the charter is subject to the terms of other Charter provisions and MERO, and both contain provisions which show a clear intent to exclude parity and the rule of one from arbitration. The City further argues that a parity provision is contrary to public policy.

These questions were not ruled on by the trial court. Ordinarily, we would apply Maryland Rule 8–131, which directs us not to rule on any issue not ruled upon by the trial court. Rule 8–131, however, permits us to decide questions presented to, but not ruled upon, by the trial court, "in order to provide guidance to [the lower court] or to avoid the expense and delay of another appeal." *Jolly v. First Union Sav. & Loan*, 235 Md. 161, 165, 201 A.2d 4 (1964). In this instance, it is desirable to rule on both issues to avoid the delay and expense of another appeal, and to guide the lower court upon remand, and we will therefore consider both issues.

### III.

### The Parity Provision Was Arbitrable

The City contends that the parity provision is excluded from arbitration by the terms of MERO because the parity provision

> would have a chilling effect on the negotiations and affect the final agreement reached with the police union ... [and] any such interference is prohibited by MERO ... which give[s] employees the right to free, collective and good faith bargaining through exclusive representatives ... [and] pro-

tects the employer and the employee representative from interference in the exercise of their rights.

It also relies upon the Charter, arguing that

[t]he Charter requires that the City provide for the manner of establishing units appropriate for collective bargaining and designating or selecting exclusive bargaining representatives. The Charter also mandates that employee organizations be designated as the exclusive representatives for each unit.

The City contends that a parity provision prevents it from negotiating exclusively and in good faith with the police union, because the police union would essentially be negotiating wages for both itself and the Firefighters. It argues that it would be prevented from bargaining in good faith with the police union because of its obligations to the Firefighters. As a result, it argues, "the wage and benefit parity provisions would tend to create an upper limit above which the police union cannot go without facing the consequences of the parity provisions." It contends that courts will not enforce a collective bargaining agreement that is contrary to public policy, and argues that public policy is a question for the courts, "which ascertain what is public policy by reference to laws and legal precedents."

The Unions respond that Charter section 55(b) is clear and unambiguous. They contend that it vests in the Board of Arbitration the authority to resolve collective bargaining disputes over "terms and conditions of employment," and that a parity provision is a term and condition of employment because it directly relates to wages. They emphasize that MERO explicitly defines "terms and conditions of employment" to include wages. The Unions = further argue that MERO is consistent with parity, and that parity has been included in prior MOU's for many years without adverse effect.

In support of its position, the City cites cases from other jurisdictions that have struck down parity provisions. In *Local 1219, I.A.F.F. v. Connecticut Labor Relations Bd.*, 171

Conn. 342, 370 A.2d 952 (1976), a firefighter union and a municipal employer entered into a three-year collective bargaining agreement. The agreement provided that "[i]t is understood and agreed that if the borough grants to the police department any additional [benefits] over and above this contract and during its term, the employees in this bargaining unit will be granted the same additional benefits...." *Id.* at 955. After the municipality refused to give the same additional benefits to the firefighters that it gave police officers, the union initiated a grievance procedure before the board of mediation and arbitration. The board ultimately refused to enforce the parity provision, and this decision was affirmed by the trial court.

The Connecticut Supreme Court agreed, and held that the parity provision was unenforceable. In reaching its decision, the Court relied on Conn. General Statute § 7–468(a), which provided that employees have the right "to bargain collectively ... on questions of wages ... free from ... interference, restraint or coercion," and Conn. General Statute § 7–471(3), which required employees of municipal fire and police departments to be in separate collective bargaining groups. The Court reasoned that

> the police union's right to bargain has been completely taken from ·it. By voiding parity clauses in circumstances similar to those found in the present case, the defendant board preserves the wall of separation mandated by the statute. The [board's] action will also ensure that the units will be allowed to tie themselves to a rule of equality only if each unit agrees with the other that their interests are the same.

*Id.* at 957.

A similar result was reached in *Lewistown Firefighters Ass'n, Local 785, I.A.F.F. v. City of Lewistown,* 354 A.2d 154 (Me.1976). In *Lewiston,* the city charter contained a parity provision and the firefighters' union entered into a series of contracts that contained a parity provision. After being refused a wage increase based on the parity provision, the police

union brought suit challenging both the city charter and contract provision. In support of its position, the police union contended that the city charter wage parity provision had been implicitly repealed by the subsequent passage of the Municipal Public Employees Labor Relations Law ("MPELRL") by the Maine legislature. The Court agreed, and explained:

> We ... believe that the two fundamental purposes of the MPELRL—freedom of employee self-organization and voluntary adjustment of the terms of employment—are best effectuated through the creation of coherent bargaining units composed of employees who have 'an identifiable community of interest' in the subjects controlled by the collective bargaining agreement.
>
> .... The effect of the parity pay provision is to place the bargaining representative of the [police union] in the position of negotiating wages not only for those whom he was chosen to represent but, indirectly, for the [firefighters union] as well. The facts of this case clearly show how the parity pay provision has ... affected the public employer's perception of its freedom to negotiate this aspect of the employment relationship.... [T]he procedures established by the MPELRL for determining the configuration of the unit whose wages will be determined by collective bargaining between its elected representative and the employer are evaded by the parity pay provision which ... necessarily interjects the interests of the [firefighters] into the unit created to represent the [police].

*Id.* at 161. Utilizing the same rationale, the Court held that the contract parity provisions were void as "contrary to public policy." *Id.* at 163.[3]

---

**3.** In this case the City also cited a New Jersey court's decision in *Bd. of Educ. v. Employees Ass'n. of Willingboro Sch.,* 178 N.J.Super. 477, 429 A.2d 429 (Ct.App.Div.1981). That case, however, did not deal with the invalidation of a parity provision. Rather, the court in that case held that an administrative board's decision to strike down a parity provision could not be applied retroactively. The court never addressed the permissibility of parity provisions in collective bargaining agreements.

Unlike the Connecticut and Maine courts, courts in other jurisdictions have held that parity provisions may be enforceable. In *Banning Teachers Ass'n. v. Public Employment Relations Bd.*, 44 Cal.3d 799, 244 Cal.Rptr. 671, 750 P.2d 313 (1988), a teachers' union contended that an administrative board erred when upholding a parity provision between teachers and "classified employees." The teachers alleged that the parity provision violated Cal. Government Code section 3545(b)(3), which required that classified and certified employees not be in the same bargaining unit, and section 3543.5(c), which required the employer to negotiate in good faith.

The California Supreme Court held that the parity provision was not *"per se* illegal." [4] In so doing, the court held that the parity provision did not violate the separate unit requirement.

> The parity agreement did not require the Teachers Association to negotiate on behalf of the classified unit. The salary increase for which the Teachers Association bargained ... may 'incidentally' benefit the classified unit, even though the Teachers Association did not in fact bargain on behalf of the classified unit to obtain the bargained-for item. However, such incidental benefit does not violate the section 3545 mandate to maintain separate negotiating units.

*Id.* at 316–17. Likewise, the court held that the parity provision did not violate the duty to negotiate in good faith, because "[p]arity agreements no more restrict the District's bargaining position than do the confines of a limited budget which exist absent such agreement. Each employee bargaining unit necessarily has an impact on the negotiations of every other unit...." *Id.* at 317. The *Banning* court also found that parity provisions were beneficial to the bargaining process.

> To hold parity agreements per se illegal would place a burdensome limitation on public school employers to negotiate effectively in an already cumbersome environment of multi-unit collective bargaining. It would obstruct employ-

---

4. The Court explained that it was "not convinced" by the Connecticut Supreme Court's decision in *Banning Teachers Ass'n,* 244 Cal.Rptr. 671, 750 P.2d at 316, supra.

ment relations, thus defeating the stated purpose of section 3512 "to foster peaceful employer-employee relations. . . ." *Id.* at 318.

A New York court reached the same conclusion in *City of Schenectady v. City Fire Fighters Union, Local 28, I.A.F.F.,* 85 A.D.2d 116, 448 N.Y.S.2d 806 (1982). In *City of Schenectady,* both the police and firefighters contracts contained parity provisions providing that "there will be no disparity in remuneration between employees covered by" the police and firefighters collective bargaining agreements. After the police union was granted certain overtime benefits not given to firefighters, the firefighters sued to uphold the parity provision. The court held that such provisions were not *per se* illegal. Rather, the court held that parity provisions require a case-by-case examination of the specific provision. *See id.* at 808. In upholding the particular provision in question, the court explained:

> The award is reasonably limited in time, for the balance of the three-year contract. The actual resolution of the dispute with the [police union] concerning overtime refutes any conclusion that the provision had impaired the city's ability to negotiate that dispute. There is nothing in the record to show that during the balance of the term of the agreement significant overtime work assignments will be required of the city's fire fighters or even if so, that remuneration therefor at the additional rate will imperil the city's finances. Apparently, for some 12 years, the city has found it to be productive of harmonious public employee relations and consistent with financial prudence . . . to include within the agreements thereby achieved a provision for equality of remuneration.

*Id.* at 809.

We agree with the New York and California courts that have held that parity provisions are not *per se* illegal and are a proper subject for arbitration. We do not find the parity provision to be violative of MERO's requirement of good faith negotiation, or its prohibition against interfering

with or restraining a certified employee organization, nor inconsistent with the Charter.

The topic of arbitration has been comprehensively examined in the treatise *How Arbitration Works, supra,* which summarizes how the scope of interest arbitration is determined in the public sector.

> Matters that are mandatory subjects of bargaining in the public sector can ordinarily be made arbitrable by agreement of the parties. However, some subject matter may fall outside the legal bargaining authority of public-sector employers because either: (1) a collective bargaining statute expressly removes it from the scope of bargaining; or (2) the subject matter is regulated by some controlling statutory law, preempting regulation by bargaining; or (3) public policy requires that responsibility over the matter, because of its nature, be exercised exclusively by the public employer. Such matters thus are not proper subjects of bargaining and in this sense may be classified as prohibited or nonnegotiable subjects.

*Id.* at 117. The contentions made by the City fall within the second and third categories, because they rest on the terms of the Charter, and MERO, and public policy derived from both.

▮▮▮▮ In interpreting Charter section 55 and MERO to resolve the thorny issue presented here, we look to the principles of statutory construction. "Every quest to discover and give effect to the objectives of the legislature begins with the text of the statute." *Huffman v. State,* 356 Md. 622, 628, 741 A.2d 1088 (1999). If the legislature's intentions are evident from the text of the statute, our inquiry normally will cease and the plain meaning of the statute will govern. *See id.* We bear in mind, however, that the plain-meaning rule is elastic, rather than cast in stone. *See Kaczorowski v. City of Baltimore,* 309 Md. 505, 513, 525 A.2d 628 (1987). If persuasive evidence exists outside the plain text of the statute, we do not turn a blind eye to it. *See id.* at 514, 525 A.2d 628. We often look to the legislative history, and other sources for a more complete understanding of what the General Assembly

intended when it enacted particular legislation. See *Harris v. State,* 331 Md. 137, 146, 626 A.2d 946 (1993). In so doing, "[w]e may also consider the particular problem or problems the legislature was addressing, and the objectives it sought to attain." *Sinai Hosp. of Baltimore v. Dep't of Employment and Training,* 309 Md. 28, 40, 522 A.2d 382 (1987). Moreover, when analyzing a statute, "we seek to avoid constructions that are illogical, unreasonable, or inconsistent with common sense." *Frost v. State,* 336 Md. 125, 137, 647 A.2d 106 (1994).

 In the instant case, we find the text of the statute clear, and do not find any other legislative purpose that calls for departure from the plain words of the statute. We agree with the Unions that the requirement in section 55 of the Charter that the City arbitrate issues "concerning the terms and conditions of employment" is broad, and on its face clearly encompasses a parity provision. Parity with the police directly addresses the amount of wages to be paid, and wages are explicitly defined in MERO as one of the terms and conditions of employment. *See* MERO, § 120(k).

The City, like the courts invalidating parity provisions, has focused on the effect that wage parity has on the negotiations between a municipality and other unions. Although a parity provision with the Firefighters may affect the bargaining between the City and the police union, the inter-relationship between the two collective bargaining processes does not originate with parity. With or without parity, the City is faced with a finite budget which circumscribes its negotiations with all of its collective bargaining units. Any benefit given to one collective bargaining unit will expend this limited budget and in that manner affect negotiations with other groups. Further, any benefit given to one union may be used as a negotiating tool by any other union—a "me too" rationale to justify adding the same benefit in the second union's package. Indeed, the Charter contemplates that wages and benefits paid to one group will influence wages and benefits negotiated for the other. In Charter section 55(b)(7), the Board of

Arbitration is directed to take into account the prevailing wages of other public employees.

We acknowledge that the inclusion of a parity provision may accelerate the "me too" process, because the increase in the Firefighters' wages is automatically triggered when the police contract is formed, rather than negotiated in a subsequent year. We also acknowledge that the City's goal of enhancing the fight against crime is a laudable one, and increasing police salaries seems a legitimate method for doing so. With a parity provision in the MOU, the City cannot make the policy decision to allocate more of its resources to police wages and benefits, rather than Firefighters.

We do not agree, however, that the rights of the police employees to form bargaining units, choose their representatives, and have their representative bargain exclusively for them is violated by inclusion of a parity provision in the Firefighters MOU. The police representatives do not have dual loyalties and are not charged with seeing that the Firefighters' wages mirror those of the police. It is the separate MOU between the City and the Firefighters that creates the parity relationship. Further, we cannot see how the economic fact that negotiations with the police union will be affected by the amount that the City is required to reserve for allocation to the Firefighters' contracts means that the City's ability to bargain in good faith is compromised. Accordingly, neither the provisions of Charter section 55(a) addressing the employees' rights to collective bargaining through exclusive representatives nor the similar provisions in MERO call for deviation from the clear language of Charter section 55(b) and MERO section 120(k). "[N]o matter how desirable, or laudatory, the [result advocated] we cannot, through the guise of statutory construction, change the plain meaning of the statute." *Baltimore County v. Wesley Chapel Bluemount Ass'n*, 128 Md.App. 180, 188, 736 A.2d 1177 (1999). Such a change would have to occur through amendment of the charter.

There has been a parity provision in every Firefighters' MOU since 1992, and in earlier contracts dating as far back as 1974. Yet, there is no allegation that the parity provision

crippled negotiations with the police union in the past. Nor is there any allegation that the police unions have pursued any legal measure to strike down such parity provisions. If the City has considered it advantageous to offer parity as a concession to induce the Unions' agreement to an MOU in the past, we do not see why we should now hold that device to be contrary to public policy in the absence of a clear statement of policy in the Charter or MERO. *Cf.* Stephen F. Befort, *Public Sector Bargaining: Fiscal Crisis and Unilateral Change,* 69 Minn. L.Rev. 1221, 1267 (1985).[5]

In sum, the Charter clearly establishes that the City must submit disputes over terms and conditions of employment to arbitration. The matter of wages indubitably is considered a term of employment. The City has agreed to parity in MOU's with the Firefighters in the past. Submitting the issue of parity to arbitration does not mean that the City has no opportunity to present evidence and argue before the arbitrators that, under current conditions, parity with the police is an unwise or undesirable provision. The issue, however, is properly to be resolved by the arbitrators. Neither the Charter, nor MERO, nor other statutory provision give us sufficient grounds on which to deviate from the clear terms of Charter section 55(b). For all of the above reasons, we reject the City's request to exclude parity from the arbitrable issues.

## IV.

### The Trial Court Must Determine On Remand Whether The Rule Of One Is Arbitrable

The City's arguments about the rule of one are more persuasive because they are based on specific provisions in the

---

**5.** Regarding the enforceability of a job security clause in the collective bargaining agreement; the author argues that "a public employer may find it advantageous to accept a limited job security provision in exchange for a reduced compensation package. . . . If an elected official or legislative body close to the negotiation process believes that such a trade-off is in the public interest, it is difficult to understand why a contrary judicial assessment of the same policy question should have preemptive effect".

Charter and MERO that we believe are inconsistent with the rule of one. Because the trial court granted the Unions' Motion to Dismiss, and thus did not receive any evidence, we are presented, however, with only a limited picture of how the rule of one operates. Without knowing more about the nature and operation of the rule of one, we are unable to fully resolve this issue in this appeal. Accordingly, we shall remand this case to the trial court for further proceedings. We exercise our discretion, however, to consider and discuss the issue, for guidance to the trial court on remand. *See* Rule 8–131.

At the time Charter sections 55(a) and 55(b) were enacted, MERO was already in effect. Charter section 55(a) specifically approved the terms of MERO, providing that "until amended by ordinance, the presently existing municipal employee relations ordinance shall remain in force and effect." Thus, we should read Charter sections 55(a) and (b) to be consistent with MERO, in determining what was intended to be arbitrable. *See Hyle v. Motor Vehicle Admin.,* 348 Md. 143, 149, 702 A.2d 760, (1997) (Court of Appeals "construes the statute as a whole, interpreting each provision of the statute in the context of the entire statutory scheme") (quoting *Blondell v. Baltimore Police,* 341 Md. 680, 691, 672 A.2d 639 (1996)); *Condon v. Univ. of Maryland,* 332 Md. 481, 491, 632 A.2d 753 (1993) ("All parts of a statute are to be read together to determine intent, and reconciled and harmonized to the extent possible").

MERO provides that the bargaining process is subject to the provisions of applicable laws concerning promotion. Section 119 provides:

Municipal agencies and employees and their representatives shall have a mutual obligation to endeavor in good faith to resolve grievances and differences relating to terms and conditions of employment with due regard for and **subject to the provisions of applicable laws relating to personnel policies, including hiring, promotion, suspension, discharge, position classification** and fixing of compensation and any and all other laws, ordinances and Charter provisions governing public employment and fiscal practices in the City of Baltimore. (Emphasis added.)

MERO reflects the City Council's intent that the City have management rights concerning promotions. MERO section 123 provides:

> Notwithstanding any other provision contained herein, it is the exclusive right of the employer to determine the mission of each of its constituent agencies, set standards of services to be offered to the public, and exercise control and direction over its organization and operations. **It is also the right of the employer to** direct its employees, to hire, **promote,** transfer, assign or retain employees in positions within an agency and in that regard to establish reasonable work rules.... **The provisions of this section shall be deemed to be a part of every memorandum of understanding reached between the employer and an employee organization** ...
>
> Any memorandum of understanding reached between the employer and employee organization shall be subject to the provisions of the Charter or applicable ordinance concerning salaries, hours of work, fringe benefits, pensions and other conditions of employment. (Emphasis added).

The policies regarding promotions are reflected in the Charter, and in rules adopted pursuant thereto. The Charter introduces the important concept that employees be promoted based on ability, efficiency, character, and industry. Charter, Art. VII, section 97 [6] directs that the Department of Personnel:

---

**6.** In 1976 and 1985, at the time that section 55, subsections (a) and (b), respectively, were enacted, there existed a different charter section with a similar provision. From 1964 to 1996, section 117 of the Baltimore City charter provided:

> The [Public Service] Commission shall provide in its rules for keeping a record of efficiency for each employee in the Competitive Class and **for making promotions on the basis of merit, to be ascertained by competitive examination, by conduct and capacity in office,** and by seniority in service ...

Thus, at the time of enactment of sections 55(a) and (b), there was already a law on the books which required that promotions be considered based both on performance in office, and on examination results. On July 1, 1996, section 117 was deleted, and revised section 97 came

(b) shall propose and submit to the [Civil Service] Commission for final approval the different classifications [of employees] that are used by the Department. Such classifications shall assure that City employees are hired and promoted **based on ability, efficiency, character, and industry ("merit")**; and shall encourage the recruitment, training and supervision of qualified employees. Classifications may be grouped into categories, which may include a general category for employees who are hired or promoted based, in part, on the results of competitive or non-competitive examinations; a labor category for unskilled or skilled laborers; and other categories that the Commission may deem to be appropriate.

\* \* \*

(e) shall provide for competitive examinations, non-competitive examinations, **and other evaluative measures, including conduct in office, demonstrated capacity,** and seniority, to assure that City employees are promoted based on merit. (Emphasis added).

Pursuant to the authority given in the Charter, rules were adopted by the Baltimore City Department of Personnel and approved by the Baltimore City Civil Service Commission. Rules 28 and 29 call for preferential hiring of qualified persons in the organizational unit who have previously been laid off. After these preferences are satisfied, the selection shall be made by the appointing authority from a list of five persons who are certified based on test scores, after an interview.

B. *Certification of the Top Five Scores*

In case no re-employment list exists or in case a re-employment list does contain an adequate number of names to fill all vacancies, the Personnel Director shall certify the appropriate eligibles from the employment list. To determine the appropriate eligibles for certification, the Director shall count one eligible from the top of the list for each

_____

into effect, having been approved by popular vote at the 1994 general election.

vacancy to use the final score for the last eligible counted as a reference score. The Director shall then certify all eligibles who receive final scores greater than or equal to the fourth score below the reference score. **For one vacancy, the top score shall be the reference score and the Director shall therefore certify all eligibles who fall within the top five scores.**

\* \* \*

E. *Actions By Appointing Officers*

Upon receipt of a certification, the appointing officer **shall invite at least five (5) certified eligibles** (or all certified eligibles if fewer than five names are certified) **for an interview and shall indicate on the Department's form the name or names of those selected** together with any other pertinent information concerning the availability or response by the eligibles.

The appointing officer may examine the applications for examination and other test papers of the persons whose names are certified for appointment. **The appointing officer may within sixty (60) days after certification, appoint one of the persons whose names have been certified** . . . . (Emphasis added).

The procedure outlined in Rule 29 allows the City to exercise its management discretion with regard to promotions. The rule of one appears to be inconsistent, however, with the selection process of Rule 29 in that the former does not give the appointing authority the opportunity to evaluate a candidate and exercise its discretion based on conduct in office and an interview, as well as test scores. Rather, it seems to remove discretion, and dictate promotion based strictly on a competitive test score.

The Unions acknowledge that the appointing authority has discretion, but argue that "[t]he rule of one is simply a tool which the appointing authority utilizes to exercise its discretion in an objective and unbiased fashion." They contend that the appointing authority, rather than hiring from the top five on the list, "is required to hire the best qualified candidate

based on more or less objective criteria." We are not persuaded by the Unions' argument because we do not see how the appointing authority can exercise discretion when it is limited to one person, determined by a written test which is not based on character or job performance.

Were we not dealing with such a sparse record, we might hold that the rule of one is a subject matter excluded from the arbitration provisions of Charter section 55 based on the reasons set forth above. Out of caution, however, we do not decide the issue because we do not have the benefit of evidence which fleshes out the nature of the tests that are given to an applicant in order to arrive at the "one" from whom the appointing authority must choose. At oral argument, counsel for the Unions suggested that the tests given were able to take into account job performance as well as character. We think the development of a record as to whether the testing process and the raw scores derived from that test takes into account these two factors is crucial to a final resolution of this issue.

Before closing, we should refer to our decision in *City of Baltimore .v. Baltimore Fire Fighters Local 734, I.A.F.F.*, 93 Md.App. 604, 613 A.2d 1023 (1992)(hereinafter *"Fire Fighters I"*), relied on by the City. There we examined the meaning of Charter section 55 and recognized that, notwithstanding the broad language of section 55(b), some management rights are excluded from the scope of the arbitration clause. *Fire Fighters I* involved the issue of whether two disputes were subject to arbitration, one over a reduction in staffing levels on fire engines, and the other regarding the employees' right to use accrued vacation leave prior to retirement. The Unions argued that "both the staffing and accrued vacation disputes involve 'terms and conditions of employment'" within the meaning of Charter section 55(b). *Id.* at 617, 613 A.2d 1023.

Under the Unions' theory, every decision involving any 'term or condition of employment'—again virtually every employment decision involving the Fire Department is subject to negotiation and arbitration.... [T]he Unions ... appear to concede[, however] that there are certain manage-

ment rights that the City (or Fire Board) has not agreed to negotiate or arbitrate. . . .

[A]lthough the City and the Union each stake out extreme positions, upon analysis it is clear that all parties concede some issues are subject to negotiation and arbitration—and some issues, involving management prerogatives, are not. The Court of Appeals' reasoning in *Montgomery Co. Educ. Ass'n Inc. v. Bd. of Educ. of Montgomery Co.,* 311 Md. 303, 534 A.2d 980 (1987) confirms that this concession is appropriate. . . . [I]t upheld as not arbitrary or capricious the State Board's decision that both the school calendar and **job classification issues were educational policy, management prerogatives, not subject to negotiation. . . . [I]t is clear that the negotiation/arbitration provisions, while containing mandatory language, are not intended to displace or nullify management prerogatives.** *Compare* Md.Educ.Code Ann. § 6–411(a) ("This subtitle does not supersede any other provisions of the Code"), *with Baltimore City Charter* art. II, § 55 (arbitration is authorized only if "consistent with the provisions of the Charter"). Thus, although the two schemes are different, both contain clear management prerogatives; clear authorization for negotiations and arbitration of labor disputes; and the indication that the latter is not to supplant the former, but rather to complement it. The interests of the employees are to be balanced against the interest of the governmental entity, school system or firefighting system, as a whole."

*Id.* at 619–20, 613 A.2d 1023 (emphasis added).

After balancing the interests of the governmental entity and the employees, we concluded that both the staffing issue and the accrued leave issue were subject to arbitration. Regarding the former, we said:

The impact of the staffing decision decreeing the number of firefighters to be assigned to a particular piece of fire equipment, unlike, for example, the impact of an order limiting the total number of firefighters on the force, does not directly affect the City budget. It is not "inextricably intertwined" with that management prerogative. Yet, it

may well more directly affect the safety of individual fire-fighters than would a wholesale limitation on the total number of firefighters. Accordingly, it is not a management prerogative totally preserved from negotiation, although a management decision to reduce the total number of firefighters well may be.

*Id.* at 622, 613 A.2d 1023 (citations omitted).

The balancing test is widely used by courts asked to determine whether particular topics are arbitrable within the meaning of arbitration provisions applicable to public sector employees. *See* Deborah Tussey, Annotation, *Bargainable or Negotiable Issues In State Public Employment Labor Relations,* 84 A.L.R.3rd 242 (2000); *see also* Eric C. Scheiner, Note, *Taking the Public Out of Determining Government Policy: The Need For An Appropriate Scope of Bargaining Test in the Illinois Public Sector,* 29 J. Marshall L.Rev. 531 (1996)(discussing balancing test). We utilized the balancing analysis in *Fire Fighters I* because we had no expression in the Charter or MERO regarding the intent of the enacting body with regard to the issue of whether the staffing issue and accrued leave issue were arbitrable. We do not need to rely on a similar analysis here because, as discussed *supra,* we have language in both MERO and the Baltimore City Charter which addresses the topic of promotions and how they are determined. *Fire Fighters I* is instructive, however, in its rejection of the Unions' assertion that the language in Charter section 55(b) must be broadly interpreted to require that all issues relating to employment be subject to arbitration. We reject that same broad contention here, based on the terms of the Charter, MERO, and *Fire Fighters I.*

**JUDGMENT REVERSED AND CASE REMANDED TO CIRCUIT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.**